UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:11-CV-00175

JIMMIE GOODE                                                    Plaintiff

v.

THE PRUDENTIAL INSURANCE                                        Defendant
COMPANY OF AMERICA

## MEMORANDUM OPINION

This administrative review is before the Court upon Plaintiff's Brief, (Docket No.

17).  Defendant has responded and moved for judgment on the administrative record,

(Docket No. 21).  The Court has reviewed the administrative record, and this matter is

now ripe for adjudication.  For the following reasons, Plaintiff's claim, (Docket No. 17),

is DENIED, and Defendant's Motion for Judgment on the Administrative Record,

(Docket No. 21), is GRANTED.

## BACKGROUND

Plaintiff Jimmie Goode was employed by Talbots as a store manager from

November 1999 until July 2, 2009.  Ms. Goode's job required general managerial skills,

as well as computer work, shipping and receiving merchandise, lifting boxes up to about

forty pounds, and changing store fixtures.  Disability benefits were provided through a

plan sponsored by Talbots and insured by Prudential.  (*See* Admin. R. D000647.)  That

plan provided that a participant is entitled to long-term disability (LTD) benefits:

when Prudential determines that:

- you are unable to perform the *material and substantial duties* of your *regular occupation* due to your *sickness* or *injury*; and
- you are under the *regular care* of a *doctor*; and
- you have 20% or more loss in your monthly earnings due to that sickness or injury.

(Admin. R. D000676 (emphasis in original).)  The plan defines "material and substantial duties" as those "normally required for the performance of your regular occupation; and [duties which] cannot be reasonably omitted or modified." (*Id.*)  "Regular occupation" is defined as: "the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location." (*Id.*)  The plan explicitly provides that Prudential is the claims administrator:  "The Prudential Insurance Company of America to which this plan pertains has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits.  The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious." (Admin. R. D000707.)

Ms. Goode began experiencing headaches sometime in early 2009 and first went out of work on July 2, 2009, due to a cataract and detached retina in her right eye.  (*See* Admin. R. D000474.)  She initially saw Dr. Tilford, an ophthalmologist, on June 3, 2009. (Admin. R. D000390.)  Ms. Goode then saw her primary care physician, Dr. Leslie, on July 14, 2009.  Dr. Leslie's records indicate that Ms. Goode had been "seen by Dr. Tilford recently who told her [that her] eyes appeared okay, changes likely related to migraines." (Admin. R. D000459.)  Dr. Leslie's records reflect that Ms. Goode indicated she wanted to retire, but was now unable to work because of changes in her vision and recurring

2

migraines.  (*Id.*)  Dr. Leslie's records also reflect that a recent MRI of Ms. Goode's brain was negative, showing only mild atrophy.  (*Id.*)

On August 6, 2009, Prudential approved Ms. Goode's claim for short-term disability (STD) benefits through August 14, (Admin. R. D000567), and on November 25, extended those benefits through November 29, (Admin. R. D000549).  On December 21, 2009, Prudential wrote to Ms. Goode denying her claim for LTD benefits, informing her again that her STD benefits terminated on November 29 and advising her of the appeals process.  (Admin. R. D000543.)  Ms. Goode appealed, and STD benefits were reinstated and approved through December 30, 2009.  (Admin. R. D000541.)

On September 29, 2009, Ms. Goode returned to Dr. Tilford, who diagnosed a tractional retinal detachment.  (Admin. R. D000394.)  Dr. Tilford performed a pneumatic retinopexy in-office, prescribed several eye medications, and ordered her to return the following day.  (*Id.*)  Ms. Goode returned to Dr. Tilford on September 30, and Dr. Tilford ordered her to maintain left-side down positioning for seven days, continue the prescribed eye medications, and return in five days.  (Admin. R. D000395.)  Ms. Goode next saw Dr. Tilford on October 5, 2009.  (Admin. R. D000397.)  Dr. Tilford noted that "Patient is recovering from pneumatic retinopexy OD," and "IOP well controlled."  (*Id.*)  Dr. Tilford ordered her to continue monitoring her vision for changes, prescribed several additional eye medications, and instructed her to return again in four days.  (*Id.*)  Ms. Goode saw Dr. Tilford again on October 8 and was scheduled for a "pars plana vitrectomy with possible gas bubble, possible scleral buckle OD."  (Admin. R. D000398.)  On October 13, Dr. Tilford performed surgery to remove a cataract and repair detachment of the retina in Ms. Goode's right eye.  (Admin. R. D000399-D000401.)  Ms. Goode then saw Drs. Tilford

3

and Baker for postoperative follow-ups on October 14, 16, 19, and 23, with her physicians noting improvements in her vision and postoperative pain on each visit. (Admin. R. D000402-D000405.)  Then on November 4, Ms. Goode reported to Dr. Baker that she was experiencing pain in her right eye and in the right side of her head, but that her vision had continued to improve.  (Admin. R. D000406.)  Dr. Baker ordered Ms. Goode to continue monitoring her vision and avoid strenuous activity, and prescribed additional eye medications.  (*Id.*)  Ms. Goode followed up again on November 6, 12, 18, and December 2, 10, and 22, consistently reporting improvements in her vision.  (Admin. R. D000407-D000412.)

On December 2, 2009, Dr. Baker wrote a letter on Ms. Goode's behalf stating that she was recovering from surgery, "is physically restricted and will be involved in a visual rehabilitation period with anticipation for another surgery in the near future," and estimating "her return to work will be the end of February 2010."  (Admin. R. D000444.)  Dr. Baker continued to monitor Ms. Goode from January through March 2010.  (Admin. R. D000360-D000365.)  Ms. Goode reported she felt her vision worsened in February, (*See* Admin. R. D000362), but improved in March, (*See* Admin. R. D000360).

Then on March 8, 2010, Ms. Goode again saw Dr. Leslie, who wrote a letter on Ms. Goode's behalf indicating that Ms. Goode should be excused from work indefinitely due to her inability to complete tasks essential to her current position because of her retinal detachment and vision loss.  (Admin. R. D000372.)  Dr. Leslie also noted that Ms. Goode was being evaluated for rheumatoid arthritis, and due to weakness, fatigue, and joint pain, was unable to life more than fifteen pounds.  (*Id.*)

Ms. Goode was referred by Dr. Leslie to Dr. Phillips, who examined her on July 20, 2010, for osteoarthritis.  (Admin. R. D000228.)  After her initial visit, Dr. Phillips opined that he saw no evidence of inflammatory arthritis, and [that] her symptoms are explained by osteoarthritis."  (Admin. R. D000232.)  Dr. Phillips also noted that "[a]ntibody testing has been negative for rheumatoid arthritis or other connective tissue disease."  (*Id.*)  He prescribed Relafen, Tylenol, and Tramadol, and referred Ms. Goode to occupational therapy, recommending a paraffin bath for her hand.  (*Id.*)  Dr. Phillips also performed an ultrasound of Ms. Goode's right hand and wrist, which revealed synovitis in the right wrist.  (Admin. R. D000227.)  Dr. Phillips noted: "[Ms. Goode] does have some component of an inflammatory arthritis.  Whether it is rheumatoid . . . is unclear." (*Id.*)  Ms. Goode received an injection of Kenalog in her hip and prescriptions for Prednisone and Plaquenil.  (*Id.*)

On August 4, 2010, Ms. Goode underwent laser surgery to remove a cataract in her right eye.  (*See* Admin. R. D000243.)  She followed up with Dr. Baker throughout September and October, reporting on October 22 that she felt her vision was improving. (Admin. R. D000238-000242.)  Dr. Baker saw Ms. Goode again on November 16, 2010, at which time she again reported that her vision "is better."  (Admin. R. D000237.)

Dr. Phillip next evaluated Ms. Goode on September 23, 2010, at which time Ms. Goode complained of right hip pain and numbness of the leg.  (Admin. R. D000233.)  Dr. Phillip's notes reflect that occupation therapy had given Ms. Goode a paraffin bath for her hand, which she described as "soothing," and advised her to sleep in a brace.  (*Id.*)

On November 15, 2010, Ms. Goode saw Dr. Hunter, a neurologist, complaining of headaches.  (Admin. R. D000259.)  She reported at that time that she could walk two

miles without resting, but that her right leg pain increased and that her leg drags by the end.  (Admin. R. D000260.)  She also reported generalized joint aching and stiffness, particularly in her right hip, as well as ongoing vision problems.  (*Id.*)  Dr. Hunter's impressions included a possible small stroke or demyelination with right upper-extremity numbness; vision problems secondary to inflammation; a mildly positive rheumatoid factor, which was managed by Plaquenil; right lower-extremity numbness; and mild hypertension.  (Admin. R. D000261.)  Dr. Hunter ordered Ms. Goode to stop taking Premarin, begin low-dose aspirin, consider stopping Adderall and using a nonamphetamine alternative, stop taking Relafin, and continue taking Plaquenil.  (*Id.*)  Dr. Hunter also ordered MRIs of the head and cervical spine, as well as EMG/EP studies. (*Id.*)

On January 17, 2011, Ms. Goode again saw Dr. Baker for evaluation of her right eye.  (Admin. R. D000150.)  She reported no significant changes in her vision, and Dr. Baker administered an injection of Kenalog into the right eye and prescribed eye medications.  (*Id.*)  Ms. Goode returned to Dr. Baker on January 20, at which time Dr. Baker noted severe intraocular inflammation in the right eye and possible infectious endophthalmitis.  (Admin. R. D000152.)   Ms. Goode followed up the next day, January 21, and again on January 25.  (Admin. R. D000153-D000154.)   On January 25, Ms. Goode reported that she was still seeing floaters but was now able to see objects with her right eye.  (Admin. R. D000154.)

On January 27, 2011, Ms. Goode returned to Dr. Hunter for a follow-up after a spinal tap, serologies, and CT scan of her chest.  (Admin. R. D000142-D000148.)  Dr. Hunter noted: "[Ms. Goode] has not been able to work since Fall 2009.  She has

permanent vision deficits.  Unremitting gait, and paresthesiae deficits.  She will not be able to work at any job." (Admin. R. D000144.)  Dr. Hunter diagnosed Ms. Goode as having demyelinating disease of the central nervous system and a disturbance of skin sensation.  (Admin. R. D000146.)  Dr. Hunter saw Ms. Goode again on March 21, 2011, when Ms. Goode complained of worsening pain and paresthesiae, numbness in her arms, and tingling and cramping at night.  (Admin. R. D000105-D000111.)  Dr. Hunter's notes, whether based on his observations or self-reported by Ms. Goode, describe her gait as staggering, stiff, having difficulties with balance, and stumbling.  (Admin. R. D000107.)

On February 24, 2010, Prudential wrote to Ms. Goode informing her that her LTD benefits had been reinstated and approved through February 3, 2010.   (Admin R. D000539.)  And on August 23, 2010, Prudential again wrote to Ms. Goode informing her that LTD benefits had been extended through February 28, 2010.  Ms. Goode appealed Prudential's decision by letter of October 18, 2010.  (Admin. R. D000291.)  In that letter, Ms. Goode claimed she was unable to meet the requirements of her position "[d]ue to the continual vision problems," and enclosed additional documentation regarding her job description. (*Id.*)

In May 2010, Prudential commissioned an independent peer review of Ms. Goode's medical records.  Dr. Payne, who is board certified in internal medicine and rheumatology, issued his report on May 28, 2010.  (*See* Admin. R. D000304-D000307.)  Dr. Payne found "no evidence of any rheumatic disease process or syndrome that is producing restrictions or limitations on activities." (Admin. R. D000305.)  Dr. Payne further stated, after consulting with Ms. Goode's primary care physician Dr. Leslie, that

7

"from a rheumatology viewpoint, there is no data that supports restrictions or limitations on activities."  (Admin. R. D000307.)

Dr. Milner, who is board certified in ophthalmology, also reviewed Ms. Goode's medical records.  In Dr. Milner's report, he noted that although "Ms. Goode may have functional impairments from February 4, 2010 forward . . . [i]t appears that she should be able to perform the tasks of a Store Manager."  (Admin. R. D000308.)  Dr. Milner stated that Ms. Goode's decrease in vision "would only limit [her] ability to work if her tasks required fine stereopsis and depth perception, such as working with and fixing small machine parts or jewelry, or performing surgery."  (*Id.*)  He noted that Ms. Goode may be sensitive to light, but documentation of her pupil sizes was necessary before making any determination as to functional impairments.  (Admin. R. at D000309.)  Dr. Milner reasoned that "from an ophthalmic standpoint," Ms. Goode "should have no restrictions in her ability to lift."  (*Id.*)  Finally, Dr. Milner concluded: "[Ms. Goode's] self-reported vision problems are not supported by the diagnostic testing and physical findings.  Any claims that she cannot use a computer, read or write based upon a decreased vision in one eye is not consistent with the provided medical records."  (Admin. R. D000310.)  Therefore, based on his review, Ms. Goode "should be able to function as a Store Manager."  (Admin. R. D000313.)

In March 2011 and in connection with Ms. Goode's appeal, Prudential commissioned a second review of Ms. Goode's medical records by Dr. Campo, board certified in internal medicine, and Dr. Goetz, board certified in ophthalmology.  (*See* Docket No. 21, at 11.)  Dr. Campo reviewed Ms. Goode's file and treatment by her various doctors, and issued his report on March 23, 2011.  (Admin. R. D000128-

8

D000133.)  Dr. Campo stated that based on his review, "the medical documentation only supports a lifting restriction in the hands of no more than 10 pounds frequently and 20 pounds occasionally on the basis of the synovitis findings by rheumatology on 9/23/10." (Admin. R. D000131.)   The duration of these restrictions, according to Dr. Campo, "could be expected to be permanent."  (Admin. R. D000131.)  Dr. Campo also noted "intermittent restrictions in gripping, handling, and grasping on the basis of intermittent synovitis," but that "[t]hese restrictions would not be considered permanent."  (*Id.*)  He stated that Ms. Goode "appears to have recovered from her last intermittent bout of synovitis, and medical documentation does not indicate problems with recovery from [her] non-ophthalmologic conditions."  (Admin. R. D000131-D000132.)  Dr. Campo went on to conclude that Ms. Goode's "self-reported symptoms of fatigue, headaches, numbness, and insomnia are not supported by medical documentation" and that notes by Drs. Phillips and Leslie do not support any additional restrictions or limitations.  (*Id.*)

Also on March 23, 2011, Dr. Goetz issued his report after reviewing Ms. Goode's medical records.  (Admin. R. D000135-D000138.)  Dr. Goetz concluded that as of March 1, 2010, Ms. Goode would have medically necessary restrictions and limitations, including restrictions against operating heavy, dangerous machinery; working at dangerous heights; and performing concentrated visual tasks, such as computer work, without a five minute break every thirty minutes.  (Admin. R. D000136.)  However, Dr. Goetz further concluded that "Full-time work is not precluded."  (*Id.*)  Dr. Goetz found no further restrictions or limitations, stating that Ms. Goode's "ocular condition does not restrict or limit her ability to sit, stand, walk, reach, lift, carry, grip, grasp, handle, pinch,

finger, perform over the shoulder activities or perform frequent and/or consistent hand activities or perform upper extremity activities."  (Admin. R. D000137.)

On April 6, 2011, Meredith Tardiff, a vocational rehabilitation specialist, reviewed Ms. Goode's job description.   (Admin. R. D000579-D000581.)   Tardiff noted Ms. Goode's ophthalmological restrictions on operating heavy, dangerous machinery; working at dangerous heights; and performing concentrated visual tasks, such as computer work, without a five minute break every thirty minutes.  (Admin. R. D000579.) She also noted medical restrictions and limitations that include lifting in the hands of no more than ten pounds frequently and twenty pounds occasionally.  (*Id.*)  Tardiff referenced the U.S. Department of Labor's *Occupational Outlook Handbook* to conclude that in Ms. Goode's position as a retail clothing store manager, the majority of her workday "is spent on customer service tasks and selling on the floor."  (Admin. R. D000580.)  Tardiff acknowledged that based on information in the *Handbook*, "it is reasonable that occasional computer use would be required," but concluded "[i]t is reasonable that a Store Manager could take a 5-minute break from computer work every 30 minutes and work on other tasks such as selling, merchandising, or stocking shelves." (*Id.*)

On April 11, 2011, after reviewing Ms. Goode's first request for reconsideration of its decision to terminate her LTD benefits, Prudential upheld its prior determination. (Admin. R. D000488-D000493.)  In its April 11 letter to Ms. Goode, Prudential recited the relevant policy provisions regarding disability, summarized Ms. Goode's medical records, and referenced the external review of Ms. Goode's medical records it had commissioned by an internal medicine physician and an ophthalmologist, concluding that

10

Ms. Goode was "not precluded from performing the material and substantial duties of [her] own occupation." (*Id.*)  Prudential further explained that Ms. Goode was entitled to again appeal its decision to Prudential's Appeals Review Unit for a final determination and outlined the complete procedure for doing so.  (Admin. R. D000492.)

On June 13, 2011, Dr. Campo submitted an addendum to his original report, responding to additional medical information submitted by Ms. Goode on appeal. (Admin. R. D000080-D000081.)  Dr. Campo stated that the additional information did alter his previous assessment, "but in light of the lack of information regarding follow up, thus would result in the further environmental and postural limitations" such as "climbing ropes, scaffolds and ladders," limiting "activities involving balancing to an occasional level," and "avoid[ing] exposure to heavy machinery and other hazards."  (Admin. R. D000081.)  Dr. Campo went on to state that Ms. Goode "should be able to stand for an aggregate of four hours in a day and should be able to sit for six hours aggregate in a day." (*Id.*)  "With these limitations, [Ms. Goode] should still be able to work a forty hour week position." (*Id.*)

Ms. Goode appealed a second time, and on June 30, 2011, Prudential again upheld its decision to terminate her LTD benefits on the basis that "the medical information received did not support impairment that would prevent [Ms. Goode] from performing material and substantial duties of [her] own occupation."  (Admin. R. D000479-D000482.)  Ms. Goode filed suit in this Court on October 19, 2011, pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq*.  Ms. Goode now moves this Court to find that the decision of Defendant was arbitrary and capricious.  For the following reasons, the Court finds that Prudential's decision to

11

terminate LTD benefits was not arbitrary and capricious, and thus, not an abuse of its discretion.

## STANDARD

As an initial matter, the Court recognizes that "in an ERISA claim contesting a denial of benefits, the district court is strictly limited to a consideration of the information actually considered by the administrator." *Killian v. Healthsource Provident Adm'rs, Inc.,* 152 F.3d 514, 522 (6th Cir. 1998). The administrative record includes all documentation submitted during the administrative appeals process, "because this information was necessarily considered by the plan administrator in evaluating the merits of the claimant's appeal." *Kalish v. Liberty Mut.,* 419 F.3d 501, 511 (6th Cir. 2005).

Generally, courts "review a plan administrator's denial of ERISA benefits *de novo."  Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). However, when "a plan vests the administrator with complete discretion in making eligibility determinations, such determinations will stand unless they are arbitrary or capricious." *Id.* "The arbitrary and capricious standard is the least demanding form of judicial review and is met when it is possible to 'offer a reasoned explanation, based on the evidence, for a particular outcome.'" *Admin. Comm. of the Sea Ray Emps.' Stock Ownership & Profit Sharing Plan v. Robinson*, 164 F.3d 981, 989 (6th Cir. 1999) (citation omitted). "Consequently, a decision will be upheld 'if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence.'" *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (citations omitted). "[T]he Court must decide whether the plan administrator's decision was 'rational in light of the

plan's provisions.'"  *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir.2000). However, the Court may not substitute its own judgment for that of the plan administrator.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

Although the arbitrary and capricious standard is deferential, it is not "without some teeth." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (citation omitted).  The Court's obligation to review the administrative record "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id.*  As the Sixth Circuit has noted, without such a review, "courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence—no matter how obscure or untrustworthy—to support a denial of a claim for ERISA benefits." *Id.*

## DISCUSSION

The parties agree that "arbitrary and capricious" is the appropriate standard of review.  Plaintiff asserts that Defendant's denial of benefits was arbitrary and capricious because (1) the Plan is both administered and paid out by Defendant, (2) Defendant's decision in denying Plaintiff's claim was not "the result of a deliberate principled reasoning process," and (3) that decision was not supported by substantial evidence.  The Court addresses each of these arguments in the order presented.

### I.    Conflict of Interest

Even under the highly deferential "arbitrary and capricious" standard, the Court must take into consideration the fact that Prudential is acting under a potential conflict of interest because it is "both the decision-maker, determining which claims are covered,

and the payor of those claims." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005); *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). However, a conflict of interest is just one factor considered in the Court's determination—it does not change the standard of review. *See Glenn*, 554 U.S. at 115. In *Metropolitan Life Insurance Co. v. Glenn*, the Supreme Court held that a conflict of interest is of greater importance where there is "a history of biased claims administration." *Id.* at 117. A conflict should not be a substantial factor, however, if the insurer has taken steps to reduce bias, such as "walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking." *Id.* This Court has repeatedly interpreted these statements to mean that "courts are duty-bound to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts." *E.g. Thies v. Life Ins. Co. of N. Am.*, 804 F. Supp. 2d 560, 573 (W.D. Ky. 2011) (quoting *Denmark v. Liberty Life Assurance Co. of Bos.*, 566 F.3d 1, 9 (1st Cir. 2009)); *Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*, 2012 WL 3109496, at *12 (W.D. Ky. July 31, 2012); *Phillips v. Life Ins. Co. of N. Am.*, 2011 WL 4435670, at *11 (W.D. Ky. Sept. 22, 2011); *Moss v. Unum Life Ins. Co. of Am.*, 2011 WL 1885166, at *9 (W.D. Ky. May 18, 2011).

Here, Ms. Goode has provided no evidence of bias on the part of Prudential. *See Swiger v. Cont'l Cas. Co.*, 2008 WL 1968346 (E.D. Ky. May 2, 2008) (according little to no weight to the potential conflict of interest where plaintiff offered no evidence that the conflict affected the decision to deny benefits); *accord Nuyt v. Sun Life Assurance Co. of Can.*, 2009 WL 5214994, at *4 (W.D. Ky. Dec. 22, 2009). Rather, Ms. Goode merely

14

suggests that the Court consider the conflict of interest because "every dollar provided in benefits is a dollar spent by Prudential, and every dollar saved is a dollar in Prudential's pocket."  (Docket No. 17, at 7.)  But here, Prudential has convincingly outlined a set of procedural safeguards implemented to avoid or diminish such potential bias:

> For example, separate review units make the initial claim and appeal determinations.  The employee responsible for making the initial claim determination is not involved in making the first level appeal decision.  Additionally, and while not required by ERISA, Prudential also provides for a second level voluntary appeal on all claims.  Thus participants clearly have the opportunity to respond to any and all arguments that were raised during the first level appeal.  Furthermore, Prudential uses outside vendors . . . to select appropriate credentialed physicians to conduct medical record reviews and/or IMEs.  Prudential does not select or influence the selection of the specific physician based on whether their opinions are or were favorable to Prudential's financial interests.

(Docket No. 21, at 16-17 (internal citations omitted).)   Based on this information, the Court finds that only the slightest weight should be given to the inherent conflict of interest in the Court's arbitrary and capricious analysis.

## II.   Deliberate Principled Reasoning Process

Based on the whole of the administrative record in the present case, the Court finds that Prudential's decision was the result of a deliberate principled reasoning process.  In its August 23, 2010, letter to Ms. Goode, Prudential explained in detail the reasons for its determination that Ms. Goode was not eligible for LTD benefits after February 28, 2010.  (*See* Admin. R. D000515-D000520.)  In that letter, Prudential recited the relevant policy provisions and definitions in full, provided excerpts from its consulting physician's and ophthalmologist's reports, and explained its conclusions regarding Ms. Goode's restrictions and limitations and their effect on her ability to work.

15

(*See id.*)  Also in both its April 11 and June 30, 2011, letters, Prudential outlined the reasons for upholding its decision to terminate LTD benefits, which included:  (1) the relevant policy provisions and definitions; (2) a thorough summary of Ms. Goode's medical history; (3) explanations of the opinions of Prudential's independent physician reviewers in regard to Ms. Goode's restrictions and limitations; (4) a discussion of the "Activities of Daily Living" log completed by Ms. Goode on December 3, 2010; and (5) an explanation of how Prudential classified and defined Ms. Goode's occupation as a retail store manager.  (*See* Admin. R. D000479-D000482, D000488-D000493.)  In short, Prudential explained its reasoning for concluding that Ms. Goode was not precluded from performing the material and substantial duties of her occupation.  Taken as a whole, these explanations suffice to demonstrate that Prudential's decision was the result of a "principled and deliberative reasoning process."  *Glenn v. MetLife*, 461 F.3d 660, 674 (6th Cir. 2006), *aff'd*, *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

## III. Substantial Evidence

The Court is satisfied that Prudential's decision to terminate Ms. Goode's LTD benefits was supported by substantial evidence.  In denying Ms. Goode's claims, Prudential based its determination both on the records of Ms. Goode's treating physicians as well as its own vocational specialist and independent physician reviewers.

Prudential does not dispute that Ms. Goode suffers from mild osteoarthritis and impaired vision in her right eye.  (Docket No. 21, at 18.)  But, Prudential maintains that those medical conditions do not preclude Ms. Goode from performing the "substantial and material duties of her occupation" as defined in the Prudential policy.  (*See id.*)  Ms. Goode initially left work in July 2009 because of migraine headaches and vision

problems.  She related to her primary care physician that she wanted to retire, but could no longer work because her headaches were brought about by work-related stress. Prudential initially approved Ms. Goode's STD benefits for the maximum duration and eventually approved LTD benefits through February 2010.

As part of the basis for this determination, Prudential referenced the records from Ms. Goode's treating ophthalmologist, which suggested that Ms. Goode would be able to return to work beginning March 2010.  (*See* Admin. R. D000519.)  But as Prudential points out, "[a]fter Plaintiff's benefits were terminated, . . . she claimed her disability was now based on her joint pain."  (Docket No. 21, at 19 & n.4.)  Despite that (1) Ms. Goode's primary care physician Dr. Leslie wrote a letter on March 8, 2010, stating that Ms. Goode should be excused from work indefinitely because of her vision problems and "questionable rheumatoid arthritis," (Admin. R. D000372), and (2) that her examination on July 20, 2010, relates that she had been experiencing joint pain for "about 10 years," (Admin R. D000228), Ms. Goode cited neither joint pain nor arthritis as a basis for leaving work in July 2009.  (*See* Admin. R. D000474 (Question: "What is the reason for your absence?  Answer: "migraines, ruptured retina in eye due to migraines.").)  In fact, the record does not appear to reflect that Ms. Goode began to complain of joint pain until around March 2010.  (*See* Admin. R. D000372.)  And on both October 13 and November 23, 2010, Ms. Goode's treating rheumatologist Dr. Phillips described her inflammatory arthritis as "mild," and noted on November 23 that her joints "are 'better.'"  (Admin. R. D000214, D000219, D000222.)  Also in November 2010, Ms. Goode's treating neurologist Dr. Hunter recorded, "Migraines: none since June, 2010."  (Admin. R. D000260.)  Dr. Hunter also noted the following impression: "Generalized joint aching.

17

Mildly positive rheumatoid factor.  managed on Plaquenil." (Admin. R. D000261.)  As Prudential suggests, none of these clinical observations further the conclusion that Ms. Goode's mild, seemingly well-managed arthritis precluded her from performing the material duties of her occupation as a retail clothing store manager.

In reviewing Ms. Goode's claim, Prudential obtained the opinions of four independent physicians, two specializing in internal medicine and two in ophthalmology. Each of these physicians, after reviewing Ms. Goode's medical records, concluded that although Ms. Goode would have some restrictions and limitations, she was not precluded from performing the substantial and material duties of her occupation.  Prudential relied heavily on those opinions in concluding that Ms. Goode was not disabled within the meaning of the Prudential policy and thus denying her claim for benefits.

First, the Court notes that conducting a file review only is not necessarily arbitrary and capricious.  *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005) ("[W]e find nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination.").  Still, it is a factor to be considered in the Court's determination.  *See Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006).  "[T]he failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination."  *Calvert*, 409 F.3d at 295. Here, Prudential's policy explicitly reserves the right to require a physical examination "by doctors, other medical practitioners or vocational experts of our choice."  (Admin. R. D000479.)  It does not appear from the record that such an examination was ever requested.  Therefore, the Court considers this a factor in its analysis.  *See Nuyt v. Sun*

18

*Life Assurance Co. of Can.*, 2009 WL 5214994, at *6 (applying *Calvert*, 409 F.3d at 295)).   However, for the reasons that follow, the Court finds that no greater or lesser weight should necessarily be given to this factor.

The Supreme Court has made clear that: "Nothing in [ERISA] suggests that plan administrators must accord special deference to the opinions of treating physicians.   Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003).   Accordingly, a plan administrator may choose to rely on the medical opinion of one doctor over another, so long as the administrator offers a reasonable explanation based on the evidence for its decision. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006) (citing *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003)); *see also Roumeliote v. Long Term Disability Plan for Emps. of Worthington Indus.*, 475 F. Supp. 2d 742, 746 (S.D. Ohio 2007), *aff'd*, 292 F. App'x 472 (6th Cir. 2008).   Because Prudential relied on the reviewing physician's reports, the Court must therefore look to the reasonableness of those opinions.   A reviewing physician's file review will be found arbitrary and capricious when "the review has been conducted by a doctor employed by the plan administrator who based his decision on selected portions of the administrative record or whose findings were inherently inconsistent or contradicted objective medical findings." *Smith v. Health Servs. of Coshocton*, 314 F. App'x 848, 860 (6th Cir. 2009).

In the present case, the Court finds the decisions of the consulting physicians reasonable.   It appears from their reports that none of them based their decision on selected portions of the record, but instead reviewed and considered the entirety of Ms.

Goode's record.  In contrast to the reviewer in *Calvert v. Firstar Finance, Inc.*, the consulting physicians in this case provided thorough summaries of Ms. Goode's medical history and treatment, which show no gaps in the records that were reviewed.  *See* 409 F.3d at 296-97 (finding a file review arbitrary and capricious where reviewer neither described the data reviewed nor made any mention of key medical records). Additionally, the conclusions reached by the consulting physicians appear to be supported by the evidence in the administrative record.

Although Prudential relied heavily on the reviewing consultants, it did not wholly discount or disregard Ms. Goode's treating physicians. Prudential apparently did rely on its reviewing physicians' opinions over Dr. Leslie's; however, this decision does not appear unreasonable.  Specifically, Prudential does not appear to have accorded significant weight to Dr. Leslie's letter of March 8, 2010.  (*See* Admin. R. D000372.)  But in that letter, which in substance consists of only one brief paragraph, Dr. Leslie offers few specifics[1] regarding Ms. Goode's restrictions or limitations before concluding that Ms. Goode should be "excuse[d] from work indefinitely."  (*Id.*)  By comparison, each of Prudential's independent reviewing physicians explained in considerable detail their opinions regarding the particular restrictions and limitations supported by Ms. Goode's medical records.  Dr. Payne, who consulted with Dr. Leslie regarding Ms. Goode's condition, did not agree with Dr. Leslie's conclusion of an indefinite period of disability. (*See* Admin. R. D000495-D000498.)  In fact, Dr. Payne found no evidence of rheumatic disease that would support any restrictions or limitations whatsoever.  (*Id.*)  Dr. Campo, who reviewed Ms. Goode's file some ten months after Dr. Payne, also disagreed with Dr.

---

[1] Namely, Dr. Leslie states only that Ms. Goode "is instructed not to drive at night and avoid prolonged light exposure," and "is unable to life >15lbs."  (Admin. R. D000372.)

Leslie's conclusion of indefinite disability, stating that "this claimant could return to work for a forty hour work week" beginning March 1, 2010, with only a lifting restriction and some intermittent restrictions involving the use of her hands.  (Admin. R. D000128-D000133.)

Prudential does not dispute that Ms. Goode suffers from continuing vision problems with her right eye; however, Prudential maintains that while those problems support certain restrictions and limitations, they do not preclude Ms. Goode from performing her material job duties.  (*See* Docket No. 21, at 18-20.)  Drs. Milner and Goetz, Prudential's independent ophthalmologist reviewers, both reached a similar conclusion.  Dr. Milner stated that Ms. Goode's decrease in vision "would only limit [her] ability to work if her tasks required fine stereopsis and depth perception, such as working with and fixing small machine parts or jewelry, or performing surgery."  (Admin. R. D000308.)  Dr. Milner concluded that "[Ms. Goode] may have functional impairments from February 4, 2010 forward [but] should be able to perform the tasks of a Store Manager."  (*Id.*)  Dr. Goetz, reviewing Ms. Goode's file in March 2011, approximately ten months after Dr. Milner, reached a similar conclusion, stating that Ms. Goode would have medically necessary restrictions and limitations but that "Full-time work is not precluded."  (Admin. R. D000135-D000138.)

Moreover, Prudential did not rely exclusively on the opinions of its own reviewing physicians.  Prudential also appears to have relied on a letter written by Ms. Goode's treating ophthalmologist, Dr. Baker, in which he approximates Ms. Goode's "return to work will be the end of February 2010."  (Admin. R. D000444, D000524.)  Therefore, on the whole, it was reasonable for the reviewing physicians to conclude

21

based on Ms. Goode's records that there were no functional limitations that would make her eligible for LTD benefits after February 28, 2010.

Thus, the Court finds Prudential's decision to terminate Ms. Goode's LTD benefits was not arbitrary and capricious.  Although there is an inherent conflict of interest, there is no evidence of bias impacting Prudential's decision, and Prudential appears to have implemented safeguards to minimize or avoid such bias.  A thorough review of Ms. Goode's medical records was conducted by four external medical consultants, and despite that no physical exam was performed, the Court finds that Prudential had a reasonable basis for relying on those consultants' opinions together with that of Ms. Goode's treating ophthalmologist instead of the opinion of her treating primary care physician.  Therefore, the Court believes these factors, taken as a whole, support the conclusion that Prudential engaged in a "deliberate principled reasoning process . . . supported by substantial evidence." *Evans v. Unum Provident Corp.,* 434 F.3d 866, 876 (6th Cir.2006).

## CONCLUSION

For the foregoing reasons, Plaintiff's claim is DENIED, and Defendant's Motion for Judgment on the Administrative Record, (Docket No. 21), is GRANTED.  An appropriate order shall issue.